UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DARRELL GUNN,

                                    Plaintiff,

        v.                                                          No. 20-CV-840 (KMK)

                                                                    OPINION & ORDER
EDWIN AYALA,

                                    Defendant.

Appearances:

Darrell Gunn
Ossining, NY
*Pro Se Plaintiff*

Sarande Dedushi, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

        Darrell Gunn ("Plaintiff") brings this Action against Edwin Ayala ("Defendant"),

pursuant to 42 U.S.C. § 1983, alleging that Defendant punched him in the face approximately

three times while he was incarcerated at Green Haven Correctional Facility ("Green Haven").

(*See generally* Compl. (Dkt. No. 2).)  Before the Court is Defendant's Motion for Summary

Judgment (the "Motion") against Plaintiff on the issue of exhaustion of administrative remedies.

(Not. of Mot. (Dkt. No. 38).)

        For the reasons stated herein, Defendant's Motion is denied.

<u>I.  Background</u>

<u>A.  Factual Background</u>

The following facts are taken from Defendant's statements pursuant to Local Civil Rule

56.1. (Rule 56.1 Statement ("Def.'s 56.1") (Dkt. No. 39).)  Additionally, where appropriate, the

Court cites directly to the admissible evidence submitted by the Parties.  The facts as described

below are in dispute to the extent indicated.[1]

---

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Civ. R. 56.1(a).  The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  *Id*. at 56.1(b).  "If the opposing party . . . fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule."  *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (citation and quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ*., 584 F.3d 412, 418 (2d Cir. 2009) (same). "A pro se litigant is not excused from this rule."  *Brandever v. Port Imperial Ferry Corp*., No. 13–CV–2813, 2014 WL 1053774, at \*3 (S.D.N.Y. Mar. 13, 2014) (italics omitted).

Here, Defendant filed and served its statement pursuant to Rule 56.1, (*see* Def.'s 56.1), in addition to the requisite statement notifying Plaintiff of the potential consequences of not responding to the Motion as required by Local Rule 56.2, (*See* Not. to Pro Se Litigant (Dkt. No. 40)).  Despite this notice, Plaintiff failed to submit a response to Defendant's 56.1 Statement of Facts.  (*See generally* Dkt.)  Accordingly, the Court may conclude that the facts in Defendant's 56.1 Statement are uncontested and admissible.  *See Brandever*, 2014 WL 1053774, at \*3 (concluding that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material issues of fact"); *Anand v. N.Y. State Div. of Hous. & Cmty. Renewal*, No. 11–CV–9616, 2013 WL 4757837, at \*7 (S.D.N.Y. Aug. 29, 2013) (same).

Nevertheless, in light of the "special solicitude" afforded to pro se litigants "when confronted with motions for summary judgment," *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988), the Court will "in its discretion opt to conduct an assiduous review of the record" when deciding the instant Motion, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). *See also Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund–Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 349 (E.D.N.Y. 2014) ("Although [the] plaintiffs did not file a Rule 56.1 statement, the Court has independently reviewed the record to ensure that there is uncontroverted evidence to support the paragraphs referenced in [the] defendants' Rule 56.1."); *Pagan v. Corr. Med. Servs.*, No. 11–CV–1357, 2013 WL 5425587, at \*2 (S.D.N.Y. Sept. 27, 2013) (explaining that "[t]he [c]ourt ha[d] considered the [motions for summary judgment] in light of the entirety of the record to afford [the pro se] [p]laintiff the special solicitude to which

Plaintiff was an incarcerated individual at Green Haven at all times relevant to this Action.  (Def.'s 56.1 ¶ 1.)  Plaintiff alleges he was assaulted by Defendant while at Montefiore-Mount Vernon Hospital on September 11, 2018.  (Dedushi Decl. Ex. D-1, at 44:19–45:10 (Dkt. No. 51).)  In his Complaint, Plaintiff alleges that before Defendant began assaulting him, he said: "Gunn writes grievances.  He writes everybody up in all prisons he goes to.  Everywhere he goes all he does is write grievances.  That's all he does!"  (Compl. ¶ 11.)  In his deposition, Plaintiff testified that after assaulting him, Defendant told other officers "Gunn likes to write grievances, he goes and writes grievances everywhere he goes."  (Dedushi Decl. Ex. D-1, at 48:25–49:14.)

At the time of the alleged assault, Plaintiff was on a hunger strike.  (Def.'s 56.1 ¶ 3.) Plaintiff was housed in the infirmary at Green Haven after the alleged assault at Montefiore-Mount Vernon Hospital until his hunger strike concluded on October 9, 2018.  (*Id*. ¶¶ 2–4.) During his hunger strike in the infirmary, Plaintiff was placed on a one-on-one watch.  (*Id*. ¶ 4.) While at the infirmary, he did not have access to any personal belongings including paper and writing utensils because he was on suicide watch.  (Dedushi Decl. Ex. D, at 59:11–13; 60:19–25; 61:5–11 (Dkt. No. 41).)

Plaintiff did not file any grievance against Defendant for allegedly assaulting him on September 11, 2018.  (Def.'s 56.1 ¶ 27; Complaint ¶ 18; Dedushi Decl. Ex. D, at 69:23–70:2.) Plaintiff testified that while at the infirmary, he did not have access to the grievance program because, at the infirmary, there are no "IGRC reps and once you are on suicide watch you have

---

he [was] entitled" where the plaintiff failed to submit a Rule 56.1 response); *Cherry v. Byram Hills Cent. Sch. Dist.*, No. 11–CV–3872, 2013 WL 2922483, at *1 (S.D.N.Y. June 14, 2013) (italics omitted) ("[W]here a pro se plaintiff fails to submit a proper . . . Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." (quotation marks omitted)).

no access to paper, pen[s], pencils, mail." (Dedushi Decl. Ex. D, at 59:6–13.) Plaintiff further testified that while at the infirmary no one asked him whether he wanted to file a grievance nor did he tell anyone that he wanted to file a grievance. (*Id*. at 59:19–61:15.)

Plaintiff testified that Correction Officer Pollins interfered with his ability to file a grievance by confiscating Plaintiff's eyeglasses before the alleged incident took place on September 11, 2018. (*Id*. at 71:4–8; 73:5–74:2.) On February 28, 2019, Plaintiff filed a grievance regarding Pollins' confiscation of his eyeglasses. (Dedushi Decl. Ex. A.) The grievance lists the incident date as February 8, 2019. (*Id*.)

Plaintiff was released from Green Haven's infirmary to the general population on October 9, 2018, 28 days after the alleged incident and right after his hunger strike concluded. (Def.'s 56.1 ¶ 8; Dedushi Decl. Ex. D, at 65:17–22.) Plaintiff still had approximately 17 days to file a grievance within 45 days of the occurrence if he gave a reason as to why he was unable to file his grievance within the default 21-day period. Once returned to his cell, Plaintiff had access to writing utensils, paper, and the grievance program. (Dedushi Decl. Ex. D, 67:16–25.) Grievances can be submitted to the grievance clerk utilizing a Grievance Complaint Form or plain paper if that form is not available. (Stanway Decl. ¶ 10 (Dkt. No. 42).) Plaintiff has filed grievances on plain paper before. (Dedushi Decl. Ex. D, at 23:18–24.) However, Plaintiff did not file a grievance or request an extension, by filing a grievance giving a reason as to why he was unable to file his grievance within the default 21-day period, after he was released to the general population. (*Id*. at 69:5–22.)

Plaintiff did not file a grievance regarding the alleged incident, he claims, out of fear of retaliation from "prison guards," who would make sure he would "get beat up again" if he filed a grievance regarding the alleged incident. (*Id*. at 54:19–55:8; 62:5–20.) Plaintiff did not have

any interaction with Defendant immediately after he was released from Montefiore-Mount Vernon Hospital, during and immediately after his release from Green Haven's infirmary, or after he was sent back to his cell.  (*Id*. at 74:7–19.)  Plaintiff had one interaction with Defendant several months after the alleged incident, but there was no alleged harassment or other actional conduct.  (*Id.* at 77:5–78:5.)

Between August 2014 and August 2019, Plaintiff filed 71 grievances. (Stanaway Decl. ¶ 15; *id*. at Ex. B (Dkt. No. 42).)  A search of the CORC computer database for appeals received from Plaintiff as of April 29, 2022 resulted in 129 results.  (Seguin Decl. Ex. B (Dkt. No. 43).)

B.  Procedural History

Plaintiff filed his initial complaint on January 30, 2020.  (Dkt. No. 2.)  Defendant filed a Motion to Dismiss on July 13, 2021.  (Dkt. No. 20.)  Plaintiff filed his Opposition on July 28, 2021.  (Dkt. No. 21.)  Defendant filed a Reply on August 30, 2021.  (Dkt. No. 22.)  The Court granted in part and denied in part Defendant's Motion to Dismiss and the Parties were 1) ordered to conduct limited discovery on non-exhaustion of administrative remedies, and 2) instructed that the instant Motion was to address solely the issue of whether Plaintiff's claims should be dismissed for failure to exhaust administrative remedies.  (Dkt. No. 23.)

Defendant filed the instant Motion on May 16, 2022.  (*See* Def.'s Mem. of Law in Supp. of Mot. for Summary Judgment ("Def.'s Mem.") (Dkt. No. 45).)  Plaintiff submitted his Opposition on June 9, 2022.  (*See* Mem. of Law for Reply to Mot. for Summary Judgment ("Pl.'s Mem.") (Dkt. No. 46).)  Defendant replied on July 8, 2022.  (*See* Reply to Mot. ("Def.'s Reply Mem.") (Dkt. No. 49).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration, citation, and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; [s]he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

6

U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharms. Tech. Corp. v. Barr Laby's. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323–24).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding

"statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (citation omitted)).

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham*, 848 F.2d at 344; *accord Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and quotation marks omitted).  Moreover, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vt. Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should . . . be[ ]made in light of the opposing party's pro se status" (italics omitted)).  "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence . . .  are insufficient to overcome a motion for summary judgment." *Houston*, 27 F. Supp. 3d at 351 (alterations, italics, and quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same).

B.  Analysis of Exhaustion Requirements Under the PLRA

1.  The PLRA Framework

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  This "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies."  *Ross v. Blake*, 578 U.S. 632, 638 (2016) (quoting *Woodford v. Ngo*, 548 U.S. 81, 85 (2006)).  This requirement applies to "all inmate suits about prison life," *Porter v. Nussle*, 534 U.S. 516, 532 (2002), "regardless of the relief offered through administrative procedures," *Booth v. Churner*, 532 U.S. 731, 741 (2001).  Moreover, the PLRA "requires proper exhaustion, which means using all steps that the prison grievance system holds out, and doing so *properly* . . . .  Proper exhaustion demands compliance with a prison grievance system's deadlines and other critical procedural rules."  *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (alterations, citations, and quotation marks omitted) (emphasis in original).

To satisfy the exhaustion requirements, a prisoner "must exhaust all levels" of DOCCS's "Inmate Grievance Program" ("IGP").  *Little v. Mun. Corp., City of N.Y.*, No. 12-CV-5851, 2017 WL 1184326, at *11 (S.D.N.Y. Mar. 29, 2017).  The IGP provides for a three-step grievance process.  *See* 7 N.Y.C.R.R. § 701 *et seq.*; *see also Abdallah v. Ragner*, No. 12-CV-8840, 2013 WL 7118083, at *2 (S.D.N.Y. Nov. 22, 2013) (noting that "[DOCCS] provides an administrative remedy for many prisoners' claims," which is "a grievance system available to prisoners in custody at state prisons" (citing 7 N.Y.C.R.R. § 701.1(c))).  Under the framework used in typical

9

cases, an inmate must first file a complaint at the facility where the inmate is housed within 21 calendar days of an alleged occurrence.  *See* 7 N.Y.C.R.R. § 701.5(a)(1).  Once filed, the representatives of the IGRC have up to 16 calendar days to resolve the grievance informally.  *Id.* § 701.5(b)(1).  If the matter is not satisfactorily resolved, the IGRC conducts a hearing to either answer the grievance or make a recommendation to the superintendent, *id.* § 701.5(b)(2)(i), which is scheduled within 16 days after receipt of the grievance, *id.* § 701.5(b)(2)(ii).  The second step in the tripartite framework is for the grievant or any direct party to appeal the IGRC's decision to the prison superintendent within seven calendar days after receipt of the IGRC's written response, although the appealing party can seek an exception to the time limit. *See id.* § 701.5(c)(1).  The third and final step is to appeal the superintendent's decision to the DOCCS Central Office Review Committee ("CORC"), which the prisoner must do within seven days of the superintendent's written response to the grievance.  *Id.* § 701.5(d)(1)(i).  Here, too, an inmate may request an exception to the time limit.  *See id.*  Given the aforementioned requirement to exhaust all levels of administrative remedies, *see Little*, 2017 WL 1184326, at *11, "only after CORC has reviewed the appeal and rendered a decision are New York's grievance procedures exhausted," *Gardner v. Daddezio*, No. 07-CV-7201, 2008 WL 4826025, at *2 (S.D.N.Y. Nov. 5, 2008).

However, the PLRA "contains its own, textual exception to mandatory exhaustion." *Ross*, 578 U.S. at 642.  As the Supreme Court has explained "the exhaustion requirement hinges on the "'availab[ility]' of administrative remedies . . . .  [A]n inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'"  *Id.* (quoting *Booth*, 532 U.S. at 738).

The Supreme Court has identified at least "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 643.  First, an "administrative procedure is unavailable when . . . it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Id.*  Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.  In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it."  *Id.* at 643–44.  Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id.* at 644.  The Second Circuit has noted "that the three circumstances discussed in *Ross* do not appear to be exhaustive," but has declined to "opine on what other circumstances might render an otherwise available administrative remedy actually incapable of use."  *Williams*, 829 F.3d at 123 n.2. Nonetheless, these three circumstances "guide the Court's inquiry."  *Khudan v. Lee*, No. 12-CV-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016).

### 2.  Existence of Grievance Process

There is no dispute that a grievance procedure exists at DOCCS and at Green Haven: Plaintiff himself has used it many times before the alleged incident.  (Stanaway Decl. ¶ 15; *id.* at Ex. B.)  Green Haven maintains an inmate grievance procedure pursuant to Department of Corrections and Community Supervision ("DOCCS") Directive 4040, and that procedure was in place while Plaintiff was housed at Green Haven in 2018.  (*See* Stanaway Decl. ¶¶ 3, 7.) Codified in 7 N.Y.C.R.R. §§ 701.1, et. seq., DOCCS Directive 4040 sets forth a three-step grievance process.  The first step requires the inmate to file a grievance with the Inmate Grievance Resolution Committee ("IGRC") within 21 days of the alleged occurrence.  (Def.'s

56.1 ¶¶ 16, 25.)  Once the IGRC has rendered a decision on the grievance, the grievant may appeal that decision to the facility Superintendent.  (Stanaway Decl. Ex. A, at 9 (Dkt. No. 42).)  Thereafter, if the grievant is unsatisfied with the decision rendered by the facility Superintendent, he may then appeal to CORC.  (Def.'s 56.1 ¶ 17.)  Incarcerated individuals may file a grievance within 45 days of the occurrence if the grievant requests an exception to the time limit for filing a grievance in writing, giving a reason as to why they were unable to file their grievance within the default 21-day period.  (*Id.* ¶ 25.)

Harassment grievances require the IGRC to give the grievance a calendar number and record it in sequence with the other grievances in the grievance clerk's log.  (Stanaway Decl. Ex. A, at 15–16.)  From there, the grievance is passed directly to the Superintendent for an initial review, and, if determined to be a harassment issue, the Superintendent will initiate an in-house investigation by higher ranking supervisory personnel into the allegations contained in the grievance.  (*Id.*)  Thereafter, if the grievant is unsatisfied with the decision rendered by the facility Superintendent, he may appeal to CORC.  (*Id.*)

Defendant contends that incarcerated individuals on one-on-one watch can request to file a grievance by informing the sergeants, who make rounds in the area where the one-on-one watch is being conducted, that they want to file a grievance.  (Lashley Decl. ¶¶ 11–14 (Dkt. No. 44).)  The sergeants would then follow up with the facility's grievance program regarding the complaint brought to their attention by the incarcerated individual.  (*Id.*)

However, Plaintiff testified that the grievance process does not exist for inmates in the infirmary on suicide watch because there are no IGRC representatives in the infirmary and inmates on suicide watch do not have access to paper, writing utensils, or mail.  (Dedushi Decl. Ex. D, at 59:6–13; Pl.'s Mem. 4.)  Furthermore, Plaintiff testified in his deposition that he

requested to speak to a sergeant to inform that person he was assaulted by a prison guard but that he was not permitted to do so.  (Dedushi Decl. Ex. D-1, at 53:20–54:15.)  Accordingly, there is a dispute as to whether the DOCCS grievance process that exists at Green Haven functions in the infirmary for inmates on suicide watch.

Whether or not a grievance procedure existed in the infirmary for individuals on suicide watch, however, is not dispositive.  Plaintiff was discharged back into the general population on October 9, 2018, 28 days after the alleged September 11, 2018 incident.  (Def.'s 56.1 ¶ 8.)  And as discussed above, the DOCCS' grievance program allows incarcerated individuals to file a grievance within 45 days of the alleged occurrence if the grievant requests an exception to the time limit for filing a grievance in writing, giving a reason as to why they were unable to file their grievance within the default 21-day period.  Thus, Plaintiff still had approximately 17 days to file a grievance after being returned to general population.  Plaintiff was aware that he could request an extension, (Dedushi Decl. Ex. D-1, at 21:7–10), and admits that he did not use the grievance procedure that existed at Green Haven regarding this incident (*see* Compl. ¶ 18; Dedushi Decl., Ex. D, 69:23–70:2).  Accordingly, Plaintiff did not exhaust all steps of the grievance process.

### 3.  Availability of Grievance Process

"Once [a] defendant[] ha[s] met [the] initial burden of demonstrating that a grievance process exists . . . a plaintiff bears the burden of 'demonstrat[ing] that other factors . . . rendered a nominally available procedure unavailable as a matter of fact.'"  *White v. Velie*, No. 16-CV-1183, 2017 WL 4082706, at *2 (2d Cir. 2017) (quoting *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015)).  In his Opposition, Plaintiff seems to advance two theories

13

regarding availability: that (1) the grievance process is a dead end, and (2) "fear, machination, and misrepresentation" prevented him from filing.  (Pl.'s Mem. 5.)

### a.  Dead End

Plaintiff's Opposition contends that there is a general mistrust of the Green Haven's grievance program.  (Pl. Mem. 4).  He also contends that the IGRC representatives and the IGRC supervisors show "fraudulent behavior," which similarly makes the process unavailable.  (*Id*.)  Plaintiff additionally states that he was "unsuccessful to file [sic] several grievance complaints and appeals were considered untimely but was never given [an] opportunity to receive or use mitigating circumstances to file grievances and appeals untimely."  (*Id*. at 3–4.)

To constitute an "available" remedy, a process requires only "the possibility of some relief."  *Ross*, 578 U.S. at 643 (citation and quotation marks omitted).  Accordingly, a plaintiff must show that the grievance process "could not lead to a change in the challenged prison policies."  *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 82 (2d Cir. 2021), *cert. denied sub nom. Green Haven Preparative Meeting v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 142 S. Ct. 2676 (2022).  Indeed, the example provided by the Court in *Ross* as a dead end involved a scenario where a prison handbook directed inmates to submit grievances to a particular administrative office when, in practice, the office disclaimed the capacity to consider grievances.  *Ross*, 578 U.S. at 643.

A search of the CORC computer database for appeals received by Plaintiff as of April 29, 2022 resulted in 129 results.  (Seguin Decl. Ex. B.)  Furthermore, between August 2014 and August 2019, Plaintiff filed 71 grievances. (Stanaway Decl. ¶15; *id*. at Ex. B.)  That Plaintiff was unsuccessful in filing several grievance complaints alone does not evidence that the grievance

process "operates as a simple dead end" when over 100 of his grievances appear to have been not only successfully submitted but also appealed. *Ross*, 570 U.S. at 643; *see also Grafton v. Hesse*, 783 F. App'x 29, 31 (2d Cir. 2019) (summary order) (noting that "several of [the plaintiff's] past grievances containing the notation "Grievance Accepted"—undermin[ed] [the plaintiff's] argument that prison staff had made the prison grievance system a dead end by not collecting and processing grievances as required"); *Cicio v. Alvarez*, No. 19-CV-9883, 2022 WL 1003796, at *5 (S.D.N.Y. Apr. 4, 2022) ("[T]he superintendent and CORC considered and ruled on [the] [p]laintiff's petitions, albeit belatedly; his pleas did not go into a black hole.") (*See* Seguin Decl. Ex. B.).  In fact, of the grievances that Plaintiff submitted with his Opposition, he won at least one, further indicating that the grievance process is not a dead end.  (*See* Pl.'s Mem. Ex. O.)  *See also Cicio*, 2022 WL 1003796, at *5 (holding that the grievance process did not operate as a dead end when plaintiff won one of his grievances).

Plaintiff also testified that he did not attempt getting an extension within the 45-day window because "the IGRC supervisor, Laura Stanaway, wouldn't give me the benefit of an extension." (Dedushi Decl. Ex. D-1, at 64:17–25.)  However, Plaintiff fails to provide evidence showing that the submission of a request for an exemption to the time limit for filing grievances operates as a dead end.  Plaintiff attaches a request for an exception to the time limit for filing an appeal regarding denied grievance GH-87455-17 dated June 26, 2019 to his Opposition.  (Pl.'s Mem Ex. Q (Dkt. No. 46).)  This grievance was denied on March 9, 2018.  (*Id*.)  However, an exception to the time limit for filing an appeal may not be granted more than 45 days after the date of the decision unless the late appeal asserts a failure to implement the decision.  (Stanaway Decl. Ex. A at 12.)  That Plaintiff may have been denied an extension that he filed past the 45-day window is not evidence that exemptions to the time limit for filing grievances are never

granted.[2]  Put simply, Plaintiff's "subjective belief does not render the remedies unavailable here."  *Cicio*, 2022 WL 1003796, at *5 (citation and quotation marks omitted) (holding that plaintiff's concerns with the grievance system because "grievances that I filed for those lawsuits were never even responded to, so this is the problem with the prison system and the grievance system. It just does not work" were insufficient to show the grievance process was a dead end).

Furthermore, Plaintiff has filed many prior grievances, some regarding misconduct similar to that alleged here.  (*See* Pl.'s Mem. Ex. I (Dkt. No. 46); Seguin Decl. Ex. B.)  Courts have found that such behavior demonstrates that the grievance process is not a dead end.  *See, e.g.*, *Smith v. Jaynes*, No. 18-CV-1107, 2022 WL 686627, at *3 (N.D.N.Y. Feb. 18, 2022) ("[A plaintiff's prior filing of grievances regarding parallel conduct] shows that [the] [p]laintiff did not view the filing of grievances as a dead end."); *Lapierre v. LaValley*, No. 15-CV-1499, 2019 WL 4015689, at *5 (N.D.N.Y. Aug. 26, 2019) (granting summary judgment because the plaintiff's prior filings "show[ ] that [he] did not view the filing of grievances as a dead end" (citation omitted)), *report and recommendation adopted*, 2019 WL 4686415 (N.D.N.Y. Sept. 26, 2019), *aff'd*, 847 F. App'x 47 (2d Cir. 2021) (summary order); *Gonzalez v. Coburn*, No. 16-CV-6174, 2017 WL 6512859, at *6 (W.D.N.Y. Dec. 20, 2017) (holding that the plaintiff's decision to affirmatively participate at all three levels in the inmate grievance program demonstrates that the program was not a dead end).

---

[2] In Exhibit U to Plaintiff's Opposition, he attaches a grievance dated August 18, 2017. In that grievance, Plaintiff writes that Laura Stanaway told him to "write Albany; I'll never give you time extension for any mitigating circumstances."  (Pl.'s Mem. Ex. U at 9.)  Because this statement is hearsay the Court does not consider it.

b.  Machination, Misrepresentation, or Intimidation

i.  Machination

Insofar as the confiscation of Plaintiff's glasses can be understood as machination, Plaintiff has not shown that the confiscation prevented him from filing grievances.  Plaintiff submitted a grievance regarding the confiscation of his eyeglasses in February 2019.  (Dedushi Decl. Ex. A.)   In the grievance, Plaintiff requested that his eyeglasses be replaced immediately. (*Id*.)  The Court will note that the handwriting in this grievance is larger than the handwriting in the other grievances Plaintiff has provided the Court, which may be a result of his lack of eyeglasses.  (*Id*.; Pl.'s Mem. Ex. B–Y.)  However, his lack of eyeglasses did not prevent him from filing the grievance as he successfully submitted a grievance regarding his lack of eyeglasses.  (Dedushi Decl. Ex. A; Stanaway Decl. Ex. B, at 3.)  Accordingly, Plaintiff cannot show that his lack of eyeglasses made the grievance process unavailable to him.

ii.  Intimidation

Plaintiff asserts that the "brotherhood culture in DOCCS creates fear to file grievance complaints."  (Pl.'s Mem. 4–5.)  Plaintiff points to a report by the Correctional Association of New York, based on surveys from 84 of 2,139 inmates at Green Haven which states that "of the inmates we interviewed, 71% reported experiencing retaliation for filing a grievance at some point and 90% described Green Haven's grievous system as poor."  (*Id*. Ex. A, at 13.)

In his Complaint, Plaintiff alleges that before Defendant began assaulting him, he told Plaintiff "Gunn writes grievances.  He writes everybody up in all prisons he goes to. Everywhere he goes all he does is write grievances.  That's all he does!"  (Compl.  ¶ 11.)  In his deposition, Plaintiff testified that after assaulting him, Defendant told other officers "Gunn likes to write grievances, he goes and writes grievances everywhere he goes."  (Dedushi Decl. Ex. D-

17

1, at 48:25–49:14.)  Plaintiff asserted that he was afraid "prison guards" were going to retaliate against him and that he would "get beat up again" if he filed a grievance regarding the alleged incident.  (Dedushi Decl. Ex. D, at 54:19–55:8; 62:5–20; 69:23–70:8.)  Plaintiff also testified, however, that no one at DOCCS besides Pollins prevented him from filing a grievance regarding the alleged incident, including Defendant.  (*Id*. at 71:4–72:3.)  Furthermore, Plaintiff has acknowledged that Defendant did not do anything regarding Plaintiff's ability to file a grievance regarding the alleged incident, (*id*. at 74:20–23), did not say anything to Plaintiff regarding his ability to file a grievance, (*id*. at 74:24–75:4), and did not prevent Plaintiff from filing a grievance regarding the alleged incident, (*id*. at 71:24–72:3).  Plaintiff had one interaction with Defendant months after the alleged incident, which he described as "with no incident."  (*Id*. at 77:2–25.)

Defendant argues that Plaintiff's "subjective general fear" that prison guards would retaliate against him is insufficient as a matter of law.  (Def.'s Mem. 11.)  Indeed, a general fear of retaliation is insufficient to render the grievance program an unavailable remedy.  *See Little*, 2017 WL 1184326, at *12 ("[A]llegations of generalized fear are insufficient to excuse [the plaintiff's] failure to exhaust."); *Contino v. City of N.Y.*, No. 11-CV-8537, 2013 WL 4015816, at *6 (S.D.N.Y. Aug. 7, 2013) ("[Plaintiff's] conclusory assertion that he feared retaliation if he completed the grievance process is insufficient to excuse his obligation to exhaust the administrative grievance process."); *Brown v. Napoli*, 687 F. Supp. 2d 295, 297 (W.D.N.Y. 2009) ("[G]eneralized fear of retaliation is insufficient to excuse his failure to file a grievance concerning these matters."); *Harrison v. Stallone*, No. 06-CV-902, 2007 WL 2789473, at *5 (N.D.N.Y. Sept. 24, 2007) ("[A] general fear of retaliation is *not* sufficient to excuse the exhaustion requirement." (emphasis in original) (citation and quotation marks omitted)).

18

Fear of retaliation is deemed general when the fear is unrelated to personal threats or intimidation connected to the grievance process. *See Medina v. Kaplan*, No. 16-CV-7223, 2018 WL 797330, at \*5 (S.D.N.Y. Feb. 8, 2018) ("Conclusory allegations of intimidation are insufficient to establish the unavailability of administrative remedies. . . . There is no allegation that the threat was even related to her grievance and ability to exhaust available administrative relief.").  For instance, in *Lucente v. County of Suffolk*, 980 F.3d 284 (2d Cir. 2020), the Second Circuit held that a plaintiff's allegations that she was afraid to report a correctional officer's sexual misconduct "because of her fear of the ongoing danger of being further sexually assaulted and sexually harassed" and "because she had learned of the beating of a female inmate" at another facility was insufficient to support a finding that the grievance process was unavailable because "neither of those fears related to threats or intimidation in connection with the grievance process itself." *Id*. at 312.  The Second Circuit noted that the plaintiff "was never threatened, or even warned, by [the defendant] or anyone else, not to complain or file a grievance." *Id*.  The Second Circuit found no support for a rule that would "allow any inmate who was claiming that a prison guard violated § 1983 based upon an act of violence or other hostile act in the jail to avoid the PLRA exhaustion requirement because of a generalized fear that any grievance or complaint could lead to more violence by that guard." *Id*.; *see also McBride v. Lopez*, 807 F.3d 982, 988 (9th Cir. 2015) ("There is no reason to allow inmates to avoid the filing requirements on the basis of hostile interactions with guards when the interaction has no apparent relation to the use of the grievance system.  Hostile interaction, even when it includes a threat of violence, does not necessarily render the grievance system 'unavailable.'").

On the other hand, "[p]rior cases have held that verbal and physical threats of retaliation, [and] physical assault" can prevent prisoners from availing themselves of grievance procedures.

*Hernandez v. Doe 1–7*, 416 F. Supp. 3d 163, 166 (E.D.N.Y. 2018) (citing *Amador v. Andrews*, 655 F.3d 89, 103 (2d Cir. 2011)); *see also Cicio*, 2022 WL 1003796, at *5 ("Specific threats of retaliation or intimidation by prison employees can render administrative remedies unavailable." (citation and quotation marks omitted)).  "The test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Lucente*, 980 F.3d at 311–12 (alteration, citation, and quotation marks omitted).  Courts in the Second Circuit have generally held that physical assaults against prisoners in retaliation for their filing of grievances would prevent an individual of ordinary firmness from pursuing the grievance process.  *See, e.g., Decolines v. Hollenbeck*, No. 20-CV-1502, 2021 WL 4947118, at *3–4 (N.D.N.Y. Oct. 25, 2021) (denying summary judgment where the plaintiff alleged that one of the officers said "you like writing grievances" prior to an assault and one told him "you should've kept your mouth shut n——r you wouldn't be going [through] this" while Plaintiff was being assaulted, because such an experience would deter a prisoner of ordinary firmness from filing an internal grievance); *Larry v. Byno,* No. 01-CV-1574, 2006 WL 1313344, at *4 (N.D.N.Y. May 11, 2006) (holding a person of "ordinary firmness" would be deterred from using the grievance process when the plaintiff was physically assaulted in retaliation for mailing a grievance); *McCullough v. Burroughs*, No. 04-CV-3216, 2005 WL 3164248, at *3–4 (E.D.N.Y. Nov. 29, 2005) (denying summary judgment where issue of fact existed as to whether plaintiff was physically assaulted by the defendants in retaliation for filing an earlier grievance, which, if true, could deter a person of ordinary firmness from using that same grievance process).

The Court recognizes that in *Decolines, Larry*, and *McCullough*, the plaintiffs had alleged beatings in response to a particular grievance or informal complaint that they had

recently submitted, which Plaintiff does not allege here.  2021 WL 4947118, at *3–4; 2006 WL 1313344, at *4; 2005 WL 3164248, at *3–4.  However, *Lucente*, does not support an interpretation of the intimidation exception that would require the act of intimidation to be tied narrowly to a particular grievance that a plaintiff filed.  *Lucente*, 980 F.3d at 313.  Indeed, in *Lucente*, the Second Circuit took care to note that an alleged violent act did not constitute intimidation because it was "*wholly unrelated* to the grievance process."  *Id.* (emphasis added) (citing *McBride*, 807 F.3d at 988 ("Although the threat need not explicitly reference the grievance system in order to deter a reasonable inmate from filing a grievance, there must be some basis in the record from which the district court could determine that a reasonable prisoner of ordinary firmness would have understood the prison official's actions to threaten retaliation if the prisoner chose to utilize the prison's grievance system.")).  The Second Circuit went so far as to note that a "plaintiff inmate's knowledge of threats or violence against another inmate by prison officials could plausibly constitute intimidation that would satisfy the objective standard" where that conduct was related to grievances filed by that other inmate.  *Id*. (citing *Rodriguez v. County of Los Angeles*, 891 F.3d 776, 793 (9th Cir. 2018) (holding that a reasonable fear of retaliation made the grievance process unavailable where, inter alia, a plaintiff filed a declaration stating that "he knew from his personal experience that other inmates had been beaten for filing grievances and that he had heard that anyone who complained about the beating that occurred during the cell extractions would face retaliation")).  Therefore, intimidation need not even be based on a plaintiff's own experience of filing grievances to make the grievance process unavailable.  *Id*.  Consequently, in the wake of *Lucente*, courts in the Second Circuit have held that "to render a grievance process unavailable, a prisoner's fear needs to 'relate[ ] to threats or intimidation in connection with the *grievance process* itself.'"  *Perez v. Kruger*, No. 12-CV-740,

2022 WL 4155654, at *3 (W.D.N.Y. Sept. 13, 2022) (emphasis added) (citing *Lucente*, 980 F.3d at 312); *Massey v. Bolanos*, No. 20-CV-8592, 2021 WL 6125804, at *3 (S.D.N.Y. Dec. 28, 2021) (holding that plaintiff failed to exhaust when he did not allege any retaliatory acts that "were in response to Plaintiff's attempts to grieve or the *grievance process in general*" (emphasis added) (citing *Lucente*, 980 F.3d at 312)).

Accordingly, in light of *Lucente*, that Plaintiff has not alleged he was beaten in response to a particular grievance does not distinguish this case from *Decolines, Larry*, and *McCullough* to Plaintiff's detriment. Here, the alleged physical assault combined with the subsequent comments regarding Plaintiff's previous filing of grievances, if true, are not "wholly unrelated to the grievance process." *Lucente*, 980 F.3d at 313. In fact, Defendants' alleged statements "Gunn likes to write grievances, he goes and writes grievances everywhere he goes," (Dedushi Decl. Ex. D-1, at 48:25–49:5), are similar to some of the statements in *Decolines,* where the court denied summary judgment, in part, because the plaintiff alleged that one of the officers said "you like writing grievances" prior to an assault, 2021 WL 4947118, at *3–4.

Furthermore, after the incident in September 2018, the record reveals that Plaintiff only filed three more grievances: two in 2019 and one in 2020. (Seguin Decl. Ex. B.) The record shows that in 2016, Plaintiff filed 41 grievances and in 2017 he filed 14. (*Id*.) Construing the record evidence in the light most favorable to Plaintiff, this reduction in grievances could be interpreted as a response to the alleged intimidation.

Accordingly, this Court cannot determine as a matter of law that a person of ordinary firmness would not have been deterred from using the grievance process after experiencing the alleged assault.

4.  Exhaustion Determination

The question of exhaustion is generally determined by the court prior to trial even if the underlying material facts are in dispute, as "the Seventh Amendment does not guarantee a jury trial on factual disputes regarding administrative exhaustion under the PLRA." *Messa v. Goord*, 652 F.3d 305, 310 (2d Cir. 2011). The *Messa* court stressed, however, that "the factual disputes relating to exhaustion [we]re not intertwined with the merits of [the plaintiff's] underlying . . . claim." *Id*. at 309. Judicial resolution of the exhaustion question therefore did not interfere with the plaintiff's Seventh Amendment right to have a jury resolve the merits of the ultimate dispute. *Id*.

Although the Second Circuit has not expressly held that a jury must resolve factual disputes regarding exhaustion when the underlying facts are entangled with those that underlie a plaintiff's substantive claims, at least three lower court decisions have so concluded. *See Stephens v. Venetozzi*, No. 13-CV-5779, 2020 WL 7629124, at *3 (S.D.N.Y. Dec. 21, 2020) ("Here, the factual issues underlying the availability of administrative remedies are plainly intertwined with [the] [p]laintiff's substantive claim of excessive force. To determine whether the grievance procedure was available to [the] [p]laintiff, the [c]ourt would necessarily have to determine whether to credit his testimony that he was assaulted on September 20 in retaliation for his previous grievances—i.e., the ultimate factual issue underlying his claim for excessive force."); *Daum v. Doe*, No. 13-CV-88, 2016 WL 3411558, at *2 (W.D.N.Y. June 22, 2016) ("[A] jury should find the facts that will determine the exhaustion issue because the factual issues relating to exhaustion are intertwined with the merits of [the plaintiff's] underlying excessive force claim." (alteration in original) (docket citation and quotation marks omitted)); *Rickett v. Orsino*, No. 10-CV-5152, 2013 WL 1176059, at *23 (S.D.N.Y. Feb. 20, 2013) ("In this case, . . .

the exhaustion-related factual disputes are not amenable to pre-trial resolution because the facts pertaining to Plaintiff's exhaustion excuses *are* intertwined with the merits of his underlying claims." (emphasis in original)), *report and recommendation adopted*, 2013 WL 1155354 (S.D.N.Y. Mar. 21, 2013).  Under these circumstances, the Court will leave it to the jury to determine the factual issues underlying the assault, which are determinative of whether administrative remedies were available to Plaintiff.

## III.  Conclusion

For the foregoing reasons, Defendant's Motion is denied.  The Court will hold a status conference on May 3, 2023 at 11:30 AM.  The Clerk of the Court is respectfully requested to terminate the pending motion at Dkt. No. 38.

SO ORDERED.

Dated:   March 28, 2023
         White Plains, New York

_____
    KENNETH M. KARAS
   United States District Judge